# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

IN RE ALBERT PATRICK CASIELLO,

*Debtor-Appellant*

(Case No. 04-12553-RCL)

---

DAVID STONE and BRISCO BALING CORP.,

*Plaintiffs-Appellees*

*v.*

ALBERT PATRICK CASIELLO,

*Defendant-Appellant*

(United States Bankruptcy Court,
Adversary Proceeding No. 02-1009)

## APPEAL FROM AN ORDER OF THE UNITED STATES
## BANKRUPTCY COURT DATED OCTOBER 20, 2004

## **BRIEF OF APPELLEES**

Evans J. Carter (BBO #076560)
HARGRAVES, KARB, WILCOX & GALVANI, LLP
550 Cochituate Road
P.O. Box 966
Framingham, MA 01701-0966

***Counsel for Plaintiffs/Appellees***

Dated:  January 5, 2005

## I.    OBJECTIONS TO THE APPELLANT'S STATEMENT OF THE CASE AND FACTS

The following points raised by the appellant in his brief are objected to:

1.    Either party could have requested a trial order during the pendency of the adversary complaint and during the initial two (2) year period, but for some unexplained reasons, the appellant considered the fact that the appellees did not do this as being unfair. Also, the appellant does not explain why he took no discovery during this time period.

2.    The court first allowed the appellees' motion for summary judgment and then denied it upon reconsideration, which was not stated by the appellant.

3.    The court never ordered the appellees to further answer their answers to Interrogatories, which was not stated by the appellant.

4.    Counsel for the Appellees objected seventy (70) times to the form of the deposition questions which was not only proper but required when the form of the questions were not properly stated as to do otherwise, would be a waiver. However, no instructions not to answer any questions was noted.

5.    A review of the annexed Motion for Reconsideration clearly shows that the appellees believe that they had a meritorious complaint against the appellant with regard to the denial of the issuance of a discharge against their claims in bankruptcy.

6.    The appellees did not stall the second session of the deposition of David Stone as they objected because the appellant's counsel refused to finish the deposition in one (1) session as he had intentionally attempted to contrive and delay the deposition because of his lack of knowledge of this complaint and the appellees did not feel that they should be subject to a second session based on the wrongful actions of appellant's counsel. At no time prior to the appellees' appearing at the deposition were they advised that the appellant would not have the time to complete the deposition on the noticed date or that another session might be required.

7.     If there are any excessive costs, which the appellees deny, then they were self-imposed by the wrongful actions of the appellant's counsel and there was no competent evidence presented that the appellees' counsel acted unreasonably or vexatiously.

8.     Nothing or no one stopped the appellant from filing whatever motions that he opted to file.

## II.    **ARGUMENT**

Bankruptcy Judge Hillman clearly explained to the appellant that the motion for sanctions and costs under 28 USC § 1927 had not been timely filed and in any event, as a matter of law, that he should be granted considerable discretion as to whether or not he will allow such a motion.

There is no evidence that Judge Hillman committed any error of law.

This is a clear case that the failure to comply with Rule 11's procedural safeguard bars a subsequent motion for sanctions.

It would be inconsistent to suggest, as the appellant does, that even though a court was not satisfied with the evidence presented to award Rule 11 sanctions, that somehow the standards must be lowered to permit him to award Section 1927 sanctions.

No legal error was made by Judge Hillman.

Respectfully submitted

David Stone and Brisco Baling Corp.
Plaintiff-Appellees
By their Attorney


/s/ Evans J. Carter
Evans J. Carter (BBO #076560)
HARGRAVES, KARB, WILCOX & GALVANI, LLP
550 Cochituate Road - P.O. Box 966
Framingham, MA  01701-0966
(508) 620-0140

Dated: January 5, 2005

-3-

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>ALBERT PATRICK CASIELLO<br><br>          Debtor | Chapter 7<br>Case No. 01-17640 WCH |
| DAVID STONE and BRISCO BALING CORP.,<br>          Plaintiffs<br>v.<br><br>ALBERT PATRICK CASIELLO<br>          Defendant. | Adversary Proceeding<br>No. 02-01009 |

### PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE COURT'S ALLOWANCE OF DEFENDANT'S MOTION FOR A DIRECTED VERDICT UNDER BANKRUPTCY RULE NO. 7052

The plaintiffs move that this Honorable Court reconsider its allowance of the defendant's

Motion for a Directed Verdict for the following reasons:

11 USC Section 523(a)(6) provides that a discharge shall not cover debts "...for willful and

malicious injury by the debtor to another or to the property of another entity."

### I. LAW

The burden of proof IS on a creditor in an action to determine nondischargeability by the

preponderance-of-the-evidence standard. See Grogan v. Garner, 498 U.S. 279, 286, 111 S.Ct. 654

(1991) (rejecting the argument that a creditor should be required to meet the clear-and-convincing-

evidence standard in nondischargeability actions).

The plaintiffs concur with the court that the latest explication of § 523(a)(6)'s reference to

"willful and malicious injury by the debtor" is contained in the ruling in Kawaauhau v. Geiger, 523

U.S. 57, 118 S. Ct. 974 (1998), which involved the dischargeability of a medical malpractice

judgment attributable to negligent or reckless conduct. The Supreme Court there determined that "[t]he

word 'willful' in a (a)(6) modifies the work 'injury,' indicating that nondischargeability takes a deliberate or intentional <u>injury</u>, not merely a deliberate or intentional <u>act</u> that leads to injury." <u>Id</u>. at 61. "We hold that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." <u>Id</u>. at 64. The Court rejected the interpretation that (a)(6) included "situations in which an act is intentional, but injury is unintended, <u>i.e.</u>, neither desired nor in fact anticipated by the debtor." <u>Id</u>. at 62.

There must be "actual intent" (page 57) as stated in the case of <u>Tinker v. Colwell</u>, 193, U.S. 473 (1903) where damages awarded for criminal conversation" were held to be nondischargeable because it was "willful and malicious" injury. It was within the recognized so-called "intentional" common law torts.

The facts in the case at bar are more closely akin to those in <u>McIntyre v. Kavanaugh</u>, 242 U.S. 238 (1916), where a broker "deprived another of his property forever by deliberately disposing of it without semblance of authority." The court held that this constituted an intentional injury to the property of another, bringing it within the bankruptcy discharge exception.

A partner in fact working on the partnership business can obligate his partner to business contracts. See, M.C.L. Chapter 10A, Section 9. Also, since the debtor signed the Asset Purchase Agreement, Consulting Agreement, Use of Name and License Agreement and Lease as the president and treasurer of a fictitious or nonexistent entity, he should not be discharged. See <u>Roberto v. FDIC</u> (in re: Roberto) 201 BR 614 (Bankr. D. Conn. 1996). See, G.L. Chapter 108A, Section 9.

## II. FACTS

It is submitted that the following facts, taken together, constitute, as a matter of law, willful and malicious, intentional injury to the plaintiffs' property.

1.    Obtaining credit from Shell Oil Company by using Brisco Baling Corp.'s oil credit card with no authorization.  (See Trial Exh. 1, Admission No. 3 and Trial Exh. No. 11)

2.    Registering a motor vehicle in Brisco Baling Corp.'s name with no authority and being issued a parking ticket (Trial Exh.11, Admission No. 3 and Trial Exh. 12)

3.    Using a nonexistent or fictitious corporate name to purchase assets from the plaintiffs and causing the plaintiffs to enter into a consulting agreement and a lease with said fictitious entity. (See Trial Exh. 2, 3, 5, 17 and G.L. Chapter 110, Section 4A.

4.    Obtaining credit in the name of Brisco Baling Corp. with no authority (See Trial Exhibit H).

5.    Purchasing a motor vehicle from Mercedes Benz in the name of Brisco Baling Corp. name with no authority.  (Trial Exh. D).

6.    Signing checks on Brisco Baling Corp.'s checking account with no authority.  (Trial Exh. 21)

7.    Obtaining credit in violation of the Use of Name and License Agreement.  (Trial Exh. 4 and 13).

8.    The defendant admitted that Paul Ventura was his partner in his dealings with the plaintiffs and the court, on 1/15/02, held Mr. Ventura's debt to the plaintiff to be nondischargeable and this should be judicial estoppel.  (Trial Exh. C)

It is submitted that the written agreements clearly did not permit the defendant to use the name, credit standing, checking account or the like of Brisco Baling Corp. d/b/a Brockton Iron and Steel Co., yet the defendant intentionally and maliciously did all of these things which intentionally caused injury to the plaintiffs.  The defendant ruined the plaintiffs' credit standing.

Query, how can you hold a nonexistent corporation liable for the consulting fees that it owed

to David Stone (Trial Exh. 3)?  How can you hold a nonexistent corporation liable under a lease to

Brisco Baling Corp. (Trial Exh. 5) for its damages?

The defendant received consideration but gave nothing back and these were clearly intentional

and malicious acts that caused injury to the plaintiffs as well.

Annexed hereto and specifically made a part hereof are:

1.    Exhibit A - Kawaauhau v. Geiger, 523 U.S. 57, 118 S. Ct. 974 (1998);

2.    Exhibit B - Tinker v. Colwell, 193 U.S. 473 (1903);

3.    Exhibit C - McIntyre v. Kavanaugh, 242 U.S. 138 (1910);

4.    Exhibit D - M.G.L. Chapter 110, Section 4A; and

5.    Exhibit E - M.G.L. Chapter 108A, Section 9.

It is submitted that, based on the above-stated reasons, the court's ruling dismissing the

plaintiffs' complaint should be vacated.

Respectfully submitted,

David Stone and Brisco Baling Corp., Plaintiffs
by their attorney,

Evans J. Carter, Esq. (BBO# 076560)
HARGRAVES, KARB, WILCOX & GALVANI
550 Cochituate Road
Post Office Box 966
Framingham, MA  01701-0966
(508) 620-0140

DATED:  September 21, 2004

**UNITED STATES BANKRUPTCY COURT, DISTRICT OF MASSACHUSETTS**
Proceeding Memorandum/Order of Court

In re: Stone et al v. Casiello                                           Case#: 02-01009    Ch:

MOVANT/APPLICATNT/PARTIES:
#1 Complaint (02-1009) David Stone  vs. Albert Patrick Casiello .  727 Objection  . ( Filing
Fee :

OUTCOME:

☐─By Agreement of the Parties `

_____Granted_____Approved_____Sustained
_____Denied_____Denied without prejudice_____Withdrawn in open court_____Overrulled
_____OSC enforced/released

_____Continued to:_____For:_____

_____Formal order/stipulation to be submitted by:_____Date due:_____
__✔__Findings and conclusions dictated at close of hearing incorporated by reference.

_____Taken under advisement:  Brief(s) due_____From_____
                                Response(s) due_____From_____
_____Fees allowed in the amount of:_$_____Expenses of:_$_____

_____No appearance/response by:_____

_____DECISION SET OUT MORE FULLY BY COURT AS FOLLOWS:

Treating defendant's motion for a directed verdict as a motion under Fed. R. Bankr.P. 7052,
for the reasons stated from the bench, the motion is granted and judgment will enter for the
defendant.
_____
_____
_____
_____
_____
_____
_____

IT IS SO NOTED:                          IT IS SO ORDERED:

                                         *[signature]*
_____             _____ Dated: 09/08/2004
Courtroom Deputy                         William C. Hillman, U.S. Bankruptcy Judge

Syllabus

# KAWAAUHAU ET VIR *v.* GEIGER

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 97–115.  Argued January 21, 1998—Decided March 3, 1998

When petitioner Kawaauhau sought treatment for her injured foot, respondent Dr. Geiger examined and hospitalized her to attend to the risk of infection.  Although Geiger knew that intravenous penicillin would have been more effective, he prescribed oral penicillin, explaining in his testimony that he understood his patient wished to minimize treatment costs.  Geiger then departed on a business trip, leaving Kawaauhau in the care of other physicians, who decided she should be transferred to an infectious disease specialist.  When Geiger returned, he canceled the transfer and discontinued all antibiotics because he believed the infection had subsided.  Kawaauhau's condition deteriorated, requiring amputation of her leg below the knee.  After trial in the malpractice suit brought by Kawaauhau and her husband, the jury found Geiger liable and awarded the Kawaauhaus approximately $355,000 in damages. Geiger, who carried no malpractice insurance, moved to Missouri, where his wages were garnished by the Kawaauhaus.  Geiger then petitioned for bankruptcy.  The Kawaauhaus requested the Bankruptcy Court to hold the malpractice judgment nondischargeable under 11 U. S. C. § 523(a)(6), which provides that a "discharge [in bankruptcy] . . . does not discharge an individual debtor from any debt . . . for willful and malicious injury . . . to another."  Concluding that Geiger's treatment fell far below the appropriate standard of care and therefore ranked as "willful and malicious," that court held the debt nondischargeable.  The District Court affirmed, but the Eighth Circuit reversed, holding that § 523(a)(6)'s exemption from discharge is confined to debts for an intentional tort, so that a debt for malpractice remains dischargeable because it is based on negligent or reckless conduct.

*Held:* Because a debt arising from a medical malpractice judgment attributable to negligent or reckless conduct does not fall within the § 523(a)(6) exception, the debt is dischargeable in bankruptcy.  Section 523(a)(6)'s words strongly support the Eighth Circuit's reading that only acts done with the actual intent to cause injury fall within the exception's scope.  The section's word "willful" modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely, as the Kawaauhaus urge, a deliberate or intentional *act* that leads to injury.  Had Congress meant to exempt debts

EXHIBIT

A

58                    KAWAAUHAU v. GEIGER

Syllabus

resulting from unintentionally inflicted injuries, it might have described
instead "willful acts that cause injury" or selected an additional word
or words, i. e., "reckless" or "negligent," to modify "injury." Moreover,
§ 523(a)(6)'s formulation triggers in the lawyer's mind the category "in-
tentional torts," which generally require that the actor intend the conse-
quences of an act, not simply the act itself. The Kawaauhaus' more
encompassing interpretation could place within the excepted category a
wide range of situations in which an act is intentional, but injury is
unintended, i. e., neither desired nor in fact anticipated by the debtor.
A construction so broad would be incompatible with the well-known
guide that exceptions to discharge should be confined to those plainly
expressed, and would render superfluous the exemptions from discharge
set forth in §§ 523(a)(9) and 523(a)(12). The Kawaauhaus rely on Tinker
v. Colwell, 193 U. S. 473, which held that a damages award for the tort
of "criminal conversation" survived bankruptcy under the 1898 Bank-
ruptcy Act's exception from discharge for judgments in civil actions for
"'willful and malicious injuries.'" The Tinker opinion repeatedly rec-
ognized that at common law the tort in question ranked as trespass vi
et armis, akin to a master's "'action of trespass and assault . . . for the
battery of his servant.'" Tinker placed criminal conversation solidly
within the traditional intentional tort category, and this Court so con-
fines its holding; that decision provides no warrant for departure from
the current statutory instruction that, to be nondischargeable, the judg-
ment debt must be "for willful and malicious injury." See, e. g., Davis
v. Aetna Acceptance Co., 293 U. S. 328, 332. The Kawaauhaus' argu-
ment that, as a policy matter, malpractice judgments should be excepted
from discharge, at least when the debtor acted recklessly or carried
no malpractice insurance, should be addressed to Congress. Debts aris-
ing from reckless or negligently inflicted injuries do not fall within
§ 523(a)(6)'s compass. Pp. 60–64.

113 F. 3d 848, affirmed.

GINSBURG, J., delivered the opinion for a unanimous Court.

*Norman W. Pressman* argued the cause for petitioners.
With him on the briefs were *Teresa A. Generous, Ronald
J. Mann,* and *Edward B. Greensfelder.*

*Laura K. Grandy* argued the cause and filed a brief for
respondent.*

---

*Gary Klein* filed a brief for the National Association of Consumer
Bankruptcy Attorneys as *amicus curiae* urging affirmance.

Cite as: 523 U. S. 57 (1998)          59

Opinion of the Court

JUSTICE GINSBURG delivered the opinion of the Court.

Section 523(a)(6) of the Bankruptcy Code provides that a debt "for willful and malicious injury by the debtor to another" is not dischargeable. 11 U. S. C. §523(a)(6). The question before us is whether a debt arising from a medical malpractice judgment, attributable to negligent or reckless conduct, falls within this statutory exception. We hold that it does not and that the debt is dischargeable.

I

In January 1983, petitioner Margaret Kawaauhau sought treatment from respondent Dr. Paul Geiger for a foot injury. Geiger examined Kawaauhau and admitted her to the hospital to attend to the risk of infection resulting from the injury. Although Geiger knew that intravenous penicillin would have been more effective, he prescribed oral penicillin, explaining in his testimony that he understood his patient wished to minimize the cost of her treatment.

Geiger then departed on a business trip, leaving Kawaauhau in the care of other physicians, who decided she should be transferred to an infectious disease specialist. When Geiger returned, he canceled the transfer and discontinued all antibiotics because he believed the infection had subsided. Kawaauhau's condition deteriorated over the next few days, requiring the amputation of her right leg below the knee.

Kawaauhau, joined by her husband Solomon, sued Geiger for malpractice. After a trial, the jury found Geiger liable and awarded the Kawaauhaus approximately $355,000 in damages.[1] Geiger, who carried no malpractice insurance,[2]

---

[1] The jury awarded Margaret Kawaauhau $203,040 in special damages and $99,000 in general damages. *In re Geiger*, 172 B. R. 916, 919 (Bkrtcy. Ct. ED Mo. 1994). In addition, the jury awarded Solomon Kawaauhau $18,000 in general damages for loss of consortium and $35,000 for emotional distress. *Ibid.*

[2] Although the record is not clear on this point, it appears that Dr. Geiger was not required by state law to carry medical malpractice insurance. See Tr. of Oral Arg. 19.

moved to Missouri, where his wages were garnished by the Kawaauhaus. Geiger then petitioned for bankruptcy. The Kawaauhaus requested the Bankruptcy Court to hold the malpractice judgment nondischargeable on the ground that it was a debt "for willful and malicious injury" excepted from discharge by 11 U. S. C. § 523(a)(6). The Bankruptcy Court concluded that Geiger's treatment fell far below the appropriate standard of care and therefore ranked as "willful and malicious." Accordingly, the Bankruptcy Court held the debt nondischargeable. *In re Geiger,* 172 B. R. 916, 922–923 (Bkrtcy. Ct. ED Mo. 1994). In an unpublished order, the District Court affirmed. App. to Pet. for Cert. A–18 to A–22.

A three-judge panel of the Court of Appeals for the Eighth Circuit reversed, 93 F. 3d 443 (1996), and a divided en banc court adhered to the panel's position, 113 F. 3d 848 (1997) (en banc). Section 523(a)(6)'s exemption from discharge, the en banc court held, is confined to debts "based on what the law has for generations called an intentional tort." *Id.,* at 852. On this view, a debt for malpractice, because it is based on conduct that is negligent or reckless, rather than intentional, remains dischargeable.

The Eighth Circuit acknowledged that its interpretation of § 523(a)(6) diverged from previous holdings of the Sixth and Tenth Circuits. See *id.,* at 853 (citing *Perkins* v. *Scharffe,* 817 F. 2d 392, 394 (CA6), cert. denied, 484 U. S. 853 (1987), and *In re Franklin,* 726 F. 2d 606, 610 (CA10 1984)). We granted certiorari to resolve this conflict, 521 U. S. 1153 (1997), and now affirm the Eighth Circuit's judgment.

## II

Section 523(a)(6) of the Bankruptcy Code provides:

"(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

"(6) for willful and malicious injury by the debtor to another entity or to the property of another entity."

The Kawaauhaus urge that the malpractice award fits within this exception because Dr. Geiger intentionally rendered inadequate medical care to Margaret Kawaauhau that necessarily led to her injury. According to the Kawaauhaus, Geiger deliberately chose less effective treatment because he wanted to cut costs, all the while knowing that he was providing substandard care. Such conduct, the Kawaauhaus assert, meets the "willful and malicious" specification of § 523(a)(6).

We confront this pivotal question concerning the scope of the "willful and malicious injury" exception: Does § 523(a)(6)'s compass cover acts, done intentionally,[3] that cause injury (as the Kawaauhaus urge), or only acts done with the actual intent to cause injury (as the Eighth Circuit ruled)? The words of the statute strongly support the Eighth Circuit's reading.

The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, *i. e.,* "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *conse-*

---

[3] The word "willful" is defined in Black's Law Dictionary as "voluntary" or "intentional." Black's Law Dictionary 1434 (5th ed. 1979). Consistently, legislative reports note that the word "willful" in § 523(a)(6) means "deliberate or intentional." See S. Rep. No. 95–989, p. 79 (1978); H. R. Rep. No. 95–595, p. 365 (1977).

Opinion of the Court

*quences* of an act," not simply "the act itself." Restatement (Second) of Torts §8A, Comment *a*, p. 15 (1964) (emphasis added).

The Kawaauhaus' more encompassing interpretation could place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, *i. e.*, neither desired nor in fact anticipated by the debtor. Every traffic accident stemming from an initial intentional act—for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic—could fit the description. See 113 F. 3d, at 852. A "knowing breach of contract" could also qualify. See *ibid.* A construction so broad would be incompatible with the "well-known" guide that exceptions to discharge "should be confined to those plainly expressed." *Gleason* v. *Thaw*, 236 U. S. 558, 562 (1915).

Furthermore, "we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 837 (1988). Reading §523(a)(6) as the Kawaauhaus urge would obviate the need for §523(a)(9), which specifically exempts debts "for death or personal injury caused by the debtor's operation of a motor vehicle if such operation was unlawful because the debtor was intoxicated from using alcohol, a drug, or another substance." 11 U. S. C. §523(a)(9); see also §523(a)(12) (exempting debts for "malicious or reckless failure" to fulfill certain commitments owed to a federal depository institutions regulatory agency).[4]

The Kawaauhaus heavily rely on *Tinker* v. *Colwell*, 193 U. S. 473 (1904), which presented this question: Does an award of damages for "criminal conversation" survive bankruptcy under the 1898 Bankruptcy Act's exception from

___

[4] Sections 523(a)(9) and (12) were added to the Bankruptcy Code in 1984 and 1990 respectively. See Pub. L. 98–353, 98 Stat. 364 (1984), and Pub. L. 101–647, 104 Stat. 4865 (1990).

Opinion of the Court

discharge for judgments in civil actions for "'willful and malicious injuries to the person or property of another'"? *Id.*, at 480. The *Tinker* Court held such an award a nondischargeable debt. The Kawaauhaus feature certain statements in the *Tinker* opinion, in particular: "[An] act is willful . . . in the sense that it is intentional and voluntary" even if performed "without any particular malice," *id.*, at 485; an act that "necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the [bankruptcy discharge] exception," *id.*, at 487. See also *id.*, at 486 (the statute exempts from discharge liability for "'a wrongful act, done intentionally, without just cause or excuse'") (quoting from definition of malice in *Bromage* v. *Prosser*, 4 Barn. & Cress. 247, 107 Eng. Rep. 1051 (K. B. 1825)).

The exposition in the *Tinker* opinion is less than crystalline. Counterbalancing the portions the Kawaauhaus emphasize, the *Tinker* Court repeatedly observed that the tort in question qualified in the common law as trespassory. Indeed, it ranked as "trespass *vi et armis*." 193 U. S., at 482, 483. Criminal conversation, the Court noted, was an action akin to a master's "action of trespass and assault . . . for the battery of his servant," *id.*, at 482. *Tinker* thus placed criminal conversation solidly within the traditional intentional tort category, and we so confine its holding. That decision, we clarify, provides no warrant for departure from the current statutory instruction that, to be nondischargeable, the judgment debt must be "for willful and malicious *injury*."

Subsequent decisions of this Court are in accord with our construction. In *McIntyre* v. *Kavanaugh*, 242 U. S. 138 (1916), a broker "deprive[d] another of his property forever by deliberately disposing of it without semblance of authority." *Id.*, at 141. The Court held that this act constituted an intentional injury to property of another, bringing it within the discharge exception. But in *Davis* v. *Aetna Ac-*

64                    KAWAAUHAU *v.* GEIGER

Opinion of the Court

*ceptance Co.,* 293 U. S. 328 (1934), the Court explained that
not every tort judgment for conversion is exempt from dis-
charge.  Negligent or reckless acts, the Court held, do not
suffice to establish that a resulting injury is "wilful and mali-
cious."  See *id.,* at 332.

Finally, the Kawaauhaus maintain that, as a policy matter,
malpractice judgments should be excepted from discharge,
at least when the debtor acted recklessly or carried no mal-
practice insurance.  Congress, of course, may so decide.
But unless and until Congress makes such a decision, we
must follow the current direction §523(a)(6) provides.

\*    \*    \*

We hold that debts arising from recklessly or negligently
inflicted injuries do not fall within the compass of §523(a)(6).
For the reasons stated, the judgment of the Court of Appeals
for the Eighth Circuit is

*Affirmed.*

Case 1:04-cv-12063-RCL   Document 4   Filed 01/05/2005   Page 17 of 28

individuals against the commission "in a court of competent jurisdiction in Travis county, Texas," and a citizen of another state sued them in the circuit court of the United States for the district which embraced Travis county, and this was held to be authorized by the state statute.

And as the establishment of rates by the commission was the establishment of rates by the state itself, and the determination of what was reasonable was left to the discretion of the commission, their action could not be regarded as unauthorized, even though they may have exercised the discretion unfairly.

Similarly, in *Pacific Gas Improv. v. Ellert*, 64 Fed. 421, where a public board was given power to improve streets, and proceeded in excess of its powers, but not in violation of them, its action was regarded by Mr. Justice McKenna, then circuit judge, as state action.

In the present case defendants were proceeding, not only in violation of provisions of the state law, but in opposition to plain prohibitions.

Section 5 of the act of March 3, 1875, 18 Stat. at L. 470, chap. 137 (U. S. Comp. Stat. 1901, p. 508), provided that if, in any suit in the circuit court, it should appear, to the satisfaction of the court, at any time, that the suit did not really and substantially involve a dispute or controversy properly within its jurisdiction, the court should proceed no further, but dismiss the suit. The last paragraph of this section was in terms repealed by the act of March 3, 1887, 24 Stat. at L. 552, chap. 373, re-enacted August 13, 1888, 25 Stat. at L. 433, chap. 866 (U. S. Comp. Stat. 1901, p. 515) (the part repealed not being material here), but otherwise the section remained and remains in full force. This case went off on the motion for preliminary injunction, and the bill was properly dismissed, whether treated as if heard on demurrer, or on the proofs by affidavit.

*Decree affirmed.*

---

(193 U. S. 441)

ARABELLA D. HUNTINGTON, Appt.,

*v.*

CITY OF NEW YORK et al.

*Jurisdiction of Federal circuit court—case involving due process of law.*

This case is governed by the decision in *Barney v. New York, ante*, 502.

[No. 173.]

See same case below, 118 Fed. 683.

THE CHIEF JUSTICE: This case is governed by the decision just announced [*Barney v. New York*, 193 U. S. —, *ante*, 502, 24 Sup. Ct. Rep. 502], and the decree is accordingly *affirmed*.

---

(193 U. S. 473)

CHARLES A. TINKER, Plff. in Err.,

*v.*

FREDERICK L. COLWELL.

*Bankruptcy—effect of discharge—judgment for damages for criminal conversation.*

A judgment for damages for criminal conversation is one recovered in an action "for wilful and malicious injuries to the person or property of another" within the meaning of the provision of the bankruptcy act of July 1, 1898 (30 Stat. at L. 550, chap. 541, U. S. Comp. Stat. 1901, p. 3428), § 17, subd. 2, excepting judgments recovered in such actions from the operation of a discharge in bankruptcy.

[No. 160.]

*Argued February 26, 1904.   Decided March 21, 1904.*

IN ERROR to the Supreme Court of the State of New York to review a judgment entered in pursuance of an affirmance by the Court of Appeals of that State of an order of the Appellate Division of the Supreme Court for the Third Department, which had in turn affirmed an order of the Special Term of the Supreme Court for the County of New York, denying the application of a bankrupt for an order discharging of record a judgment recovered against him in an action for criminal conversation. *Affirmed.*

See same case below in Appellate Division of Supreme Court, 65 App. Div. 20, 72 N. Y. Supp. 505. In Court of Appeals, 169 N. Y. 531, 58 L. R. A. 765, 62 N. E. 668.

Statement by Mr. Justice Peckham:

The plaintiff in error applied to the supreme court of the state of New York for an order discharging of record a certain judgment of that court obtained against him by the defendant in error. The application was denied (35 Misc. 330, 6 Am. Bankr. Rep. 434, 71 N. Y. Supp. 952), and the order denying it was affirmed by the appellate division of the supreme court (65 App. Div. 20, 72 N. Y. Supp. 505), and subsequently by the court of appeals (169 N. Y. 531, 58 L. R. A. 765, 62 N. E. 668), and the latter court thereupon remitted the record to the supreme court, where it remained at the time plaintiff in error sued out this writ to review the order of the court of appeals.

EXHIBIT
B
tabbies

The application was made under § 1268 of the New York Code, which provides that any time after one year has elapsed since a bankrupt was discharged from his debts, pursuant to the act of Congress relating to bankruptcy, he may apply, after notice to the plaintiff in the judgment, and upon proof of his discharge, to the court in which the judgment was rendered against him for an order directing the judgment to be canceled and discharged of record. The section further provides that if it appear on hearing that he has been discharged from the payment of that judgment or the debt upon which such judgment was recovered, an order must be made directing the judgment to be canceled and discharged of record.

The application in this proceeding was made upon a petition by plaintiff in error, which showed that Frederick L. Colwell, the plaintiff in the action, had, on February 9, 1897, recovered a judgment for $50,000 and costs against the petitioner for damages for his criminal conversation with the plaintiff's wife; that the judgment was duly docketed in the county of New York on that day; that on September 13, 1899, petitioner filed his petition in the district court of the United States for the southern district of New York, praying that he might be adjudged a bankrupt, and on that day he was adjudged a bankrupt by the district court, pursuant to the act of Congress relating to bankruptcy; on February 2, 1900, the petitioner was discharged by the district court of the United States from all debts and claims which were made provable by the act of Congress against his estate, and which existed on September 13, 1899; that the judgment above mentioned was not recovered against him for a wilful and malicious injury to the person or property of the plaintiff, within the meaning of the act of Congress, and that, by virtue of the discharge in bankruptcy, the petitioner had been duly released from that judgment.

In granting the discharge under the bankrupt act (which was opposed by the plaintiff in the judgment), the district judge refused to pass upon the question whether the judgment was thereby released, although it appears that he thought it was. 99 Fed. 79.

Mr. Nelson Smith for plaintiff in error.

Messrs. Thomas McAdam and George Newell Hamlin for defendant in error.

Mr. Justice Peckham, after making the above statement of facts, delivered the opinion of the court:

The question herein arising is whether the judgment obtained against the defendant, petitioner, for damages arising from the criminal conversation of the defendant with the plaintiff's wife, is released by the defendant's discharge in bankruptcy, or whether it is excepted from such release by reason of subdivision 2, § 17, of the bankruptcy act of July 1, 1898, which provides that "a discharge in bankruptcy shall release a bankrupt from all his provable debts, except such as . . . (2) are judgments in actions for frauds, or obtaining property by false pretenses or false representations, or for wilful and malicious injuries to the person or property of another; . . ." [30 Stat. at L. 550, chap. 541, U. S. Comp. Stat. 1901, p. 3428].

The averment in the petition, that the judgment was not recovered for a wilful and malicious injury to the person or property of the plaintiff in the action, is a mere conclusion of law, and not an averment of fact.

If the judgment in question in this proceeding be one which was recovered in an action for wilful and malicious injuries to the person or property of another, it was not released by the bankrupt's discharge; otherwise it was.

We are of opinion that it was not released. We think the authorities show the husband has certain personal and exclusive rights with regard to the person of his wife which are interfered with and invaded by criminal conversation with her; that such an act on the part of another man constitutes an assault even when, as is almost universally the case as proved, the wife in fact consents to the act; because the wife is in law incapable of giving any consent to affect the husband's rights as against the wrongdoer, and that an assault of this nature may properly be described as an injury to the personal rights and property of the husband, which is both malicious and wilful. A judgment upon such a cause of action is not released by the defendant's discharge in bankruptcy.

The assault vi et armis is a fiction of the law, assumed at first, in early times, to give jurisdiction of the cause of action as a trespass, to the courts, which then proceeded to permit the recovery of damages by the husband for his wounded feelings and honor, the defilement of the marriage bed, and for the doubt thrown upon the legitimacy of children.

Subsequently the action of trespass on the case was sustained for the consequent damage, and either form of action was thereafter held proper.

Blackstone, in referring to the rights of the husband, says (3 Bl. Com. edited by Wendell, page 139):

"Injuries that may be offered to a person, considered as a husband, are principally three: abduction, or taking away a man's

Case 1:04-cv-12553-RCL   Document 4   Filed 01/05/2005   Page 19 of 28

wife; *adultery*, or criminal conversation with her; and *beating* or otherwise abusing her. . . . 2. *Adultery*, or criminal conversation with a man's wife, though it is, as a public crime, left by our laws to the coercion of the spiritual courts; yet, considered as a civil injury (and surely there can be no greater), the law gives a satisfaction to the husband for it by action of trespass *vi et armis* against the adulterer, wherein the damages recovered are usually very large and exemplary."

Speaking of injuries to what he terms the relative rights of persons, Chitty says that for actions of that nature (criminal conversation being among them) the usual, and, perhaps, the more correct, practice, is to declare in trespass *vi et armis* and *contra pacem*. 1 Chitty, Pl. [2 vol. ed.] 150, and note h.

In *Macfadzen* v. *Olivant*, 6 East, 387, it was held that the proper action was trespass *vi et armis*, for that the defendant with force and arms assaulted and seduced the plaintiff's wife, whereby he lost and was deprived of her comfort, society, and fellowship, against the peace and to his damage. Lord Ellenborough, C. J., among other things, said:

"Then the question is, whether this can be an action on the case or an action of trespass and assault. And it is said that the latter description only applies to personal assaults on the body of the plaintiff who sues; but nothing of that sort is said in the statute. No doubt that an action of trespass and assault may be maintained by a master for the battery of his servant *per quod servitium amisit;* and so by a husband for a trespass and assault of this kind upon his wife *per quod consortium amisit*."

In, *Rigaut* v. *Gallisard*, 7 Mod. 78, Lord Holt, C. J., said that if adultery be committed, with another man's wife, without any force, but by her own consent, the husband may have assault and battery, and lay it *vi et armis*, and that the proper action for the husband in such case was a special action, *quia*,—the defendant his wife *rapuit*, and not to lay it *per quod consortium amisit*.

In *Haney* v. *Townsend*, 1 M'Cord L. 206, decided in 1821, it was held that case as well as trespass *vi et armis* is a proper action for criminal conversation, the court holding that no doubt trespass was a proper form of action for the injury done by seducing a wife, but that case was also a proper action.

In *Bedan* v. *Turney*, 99 Cal. 649, 34 Pac. 442, decided in 1893, it was held that the criminal intercourse of the wife with another man was an invasion of the husband's rights, and it was immaterial whether this

invasion was accomplished by force or by the consent of the wife; that the right belonged to the husband, and it was no defense to his action for redress that its violation was by the consent or even by the procurement of the wife, for she was not competent to give such consent; that it was not necessary that the husband should show that it was by force or against her will. The original form of the action was trespass *vi et armis*, even though the act was with the consent of the wife, for the reason, as was said by Holt, C. J., in *Rigaut* v. *Gallisard*, 7 Mod. 78, "that the law will not allow her a consent in such case to the prejudice of her husband."

In *M'Clure* v. *Miller*, 11 N. C. (4 Hawks) 133, note, page 140, trespass was held to be the proper form of action in such a case, and that a single act of adultery, though never manifested in its consequences, is an invasion of the husband's rights, and the law redresses it. It is also said that the husband has, so to speak, a property in the body and right to the personal enjoyment of his wife. For the invasion of this right the law permits him to sue as husband.

For the purpose of maintaining the action, it is regarded as an actual trespass upon the marital rights of the husband, although the consequent injury is really to the husband on account of the corruption of the body and mind of the wife, and it is in this view (that it is a trespass upon the rights of the husband) that it is held that the consent of the wife makes no difference; that she is incapable of giving a consent to an injury to the husband. 7 Mod. 78.

In *Wales* v. *Miner*, 89 Ind. 118, decided in 1883, it was held that in an action of crim. con. the wife was incapable of consenting to her own seduction so as to bar her husband's right of action.

In *Bigaouette* v. *Paulet*, 134 Mass. 123, 45 Am. Rep. 307, it was held the action could be maintained whether the conversation was with or without the consent of the wife, and although the act caused no actual loss of the services of the wife to the husband.

Many of the cases hold that the essential injury to the husband consists in the defilement of the marriage bed, in the invasion of his exclusive right to marital intercourse with his wife and to beget his own children. This is a right of the highest kind, upon the thorough maintenance of which the whole social order rests, and in order to the maintenance of the action it may properly be described as a property right.

In *Delamater* v. *Russell*, 4 How. Pr. 234, it was held that the act complained of (criminal conversation) was an injury to

the person of the plaintiff; that it was an invasion of his personal rights, and although the action was brought for depriving the plaintiff of the comfort, society, fellowship, aid, and assistance of the wife, yet it was an action brought for an injury to, and an invasion of, the plaintiff's personal rights.

The plaintiff in error refers to the case of *Oregin* v. *Brooklyn Crosstown R. Co.* 75 N. Y. 192, 31 Am. Rep. 459, same case upon second appeal, 83 N. Y. 595; 38 Am. Rep. 474, for the purpose of showing that the right to the society of the wife is not property, and therefore cannot be regarded as within the words of the bankruptcy act. The case does not decide that the right to the wife's society and comfort is not a property right on the part of the husband. It was a case brought by the husband against the railroad company for injuries negligently inflicted on the person of his wife by the company, and after the action was brought the husband died, and an application was made to revive the action in the name of the administrator of the husband. The court held that the action survived under the provisions of the state statute. 2 Rev. Stat. 447, § 1. The case then went to trial and the judge submitted to the jury the question of damages arising for the loss of the services of the wife and of her society, and it was held to be error by the court of appeals, because, while the right to the services of the wife was property, the right to her society, etc., was not property within the meaning of the statute providing for the survival of the cause of action, for the reason that the statute only provided for the survival of those rights the loss of which diminished the estate of the deceased; that the loss of the services of the wife did diminish the estate of the deceased, but that the loss to the husband of the wife's society and aid, etc., did not diminish his estate, and therefore the right of action consequent thereon did not survive the deceased. The question in the case at bar neither arose nor was referred to in the opinions delivered in that case.

We think it is made clear by these references to a few of the many cases on this subject that the cause of action by the husband is based upon the idea that the act of the defendant is a violation of the marital rights of the husband in the person of his wife, to the exclusion of all others, and so the act of the defendant is an injury to the person and also to the property rights of the husband.

We think such an act is also a wilful and malicious injury to the person or property of the husband, within the meaning of the exception in the statute.

There may be cases where the act has been performed without any particular malice towards the husband, but we are of opinion that, within the meaning of the exception, it is not necessary that there should be this particular, and, so to speak, personal malevolence toward the husband, but that the act itself necessarily implies that degree of malice which is sufficient to bring the case within the exception stated in the statute. The act is wilful, of course, in the sense that it is intentional and voluntary, and we think that it is also malicious within the meaning of the statute.

In order to come within that meaning as a judgment for a wilful and malicious injury to person or property, it is not necessary that the cause of action be based upon special malice, so that without it the action could not be maintained.

In *Bromage* v. *Prosser,* 4 Barn. & C. 247, which was an action of slander, Mr. Justice Bayley, among other things, said:

"Malice, in common acceptation, means ill will against a person; but in its legal sense it means a wrongful act, done intentionally, without just cause or excuse. If I give a perfect stranger a blow likely to produce death, I do it *of malice,* because I do it *intentionally* and without just cause or excuse. If I maim cattle, without knowing whose they are, if I poison a fishery, without knowing the owner, I do it *of malice,* because it is a wrongful act, and done intentionally. If I am arraigned of felony, and wilfully stand mute, I am said to do it *of malice,* because it is intentional and without just cause or excuse. If I traduce a man, whether I know him or not and whether I intend to do him an injury or not, I apprehend the law considers it as done of malice, because it is wrongful and intentional. It equally works an injury, whether I meant to produce an injury or not. . . . We cite the case as a good definition of the legal meaning of the word malice. The law will, as we think, imply that degree of malice in an act of the nature under consideration, which is sufficient to bring it within in the exception mentioned.

In *Re Freche* (U. S. district court, district of New Jersey, 1901) 109 Fed. 620, it was held that a judgment for the father in an action to recover damages for the seduction of his daughter was for a wilful and malicious injury to the person and property of another, within the meaning of § 17 of the bankrupt act, and was not released by a discharge in bankruptcy. Kirkpatrick, District Judge, in the course of his opinion, said:

"From the nature of the case, the act of the defendant Freche which caused the in-

jury was wilful, because it was voluntary. That act was unlawful, wrongful, and tortious, and, being wilfully done, it was, in law, malicious. It was malicious because the injurious consequences which followed the wrongful act were those which might naturally be expected to result from it, and which the defendant Freche must be presumed to have had in mind when he committed the offense. 'Malice,' in law, simply means a depraved inclination on the part of a person to disregard the rights of others, which intent is manifested by his injurious acts. While it may be true that in his unlawful act Freche was not actuated by hatred or revenge or passion towards the plaintiff, nevertheless, if he acted wantonly against what any man of reasonable intelligence must have known to be contrary to his duty, and purposely prejudicial and injurious to another, the law will imply malice."

In Leicester v. Hoadley, supreme court of Kansas, 1903, 66 Kan. 172, 71 Pac. 318, it was held that a judgment obtained by a wife against another woman for damages sustained by the wife by reason of the alienation of the affections of her husband is not released by the discharge of the judgment debtor under proceedings in bankruptcy, where such alienation has been accomplished by schemes and devices of the judgment debtor, and resulted in the loss of support and impairment of health to the wife.

It was further held that injuries so inflicted are wilful and malicious, and are to the person and property of another, within the meaning of § 17 of the United States bankrupt law.

In United States v. Reed, 86 Fed. 308, it was held that malice consisted in the wilful doing of an act which the person doing it knows is liable to injure another, regardless of the consequences; and a malignant spirit or a specific intention to hurt a particular person is not an essential element. Upon that principle, we think a wilful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done wilfully and maliciously, so as to come within the exception.

It is urged that the malice referred to in the exception is malice towards the individual, personally, such as is meant, for instance, in a statute for maliciously injuring or destroying property, or for malicious mischief, where mere intentional injury without special malice towards the individual has been held by some courts not to be sufficient. Com. v. Williams, 110 Mass. 401.

We are not inclined to place such a narrow construction upon the language of the exception. We do not think the language used was intended to limit the exception in any such way. It was an honest debtor, and not a malicious wrongdoer, that was to be discharged.

Howland v. Carson, 28 Ohio St. 625, is cited by plaintiff in error. The question arose under the old bankruptcy act, which provided (U. S. Rev. Stat. § 5117) that no debt created by fraud or embezzlement of the bankrupt, or by his defalcation as a public officer, or while acting in a fiduciary character, should be discharged by proceedings in bankruptcy, etc. It was held in the case cited that a judgment for the seduction of his daughter in favor of the father, where the seduction was not induced or accomplished under a promise of marriage fraudulently made for the purpose, was not a debt created by fraud, within the meaning of the bankruptcy act. We do not perceive the least similarity in the case to the one now before the court, nor could we say that such a debt was one created by fraud.

It is also argued that, as the fraud referred to in the exception is not one which the law implies, but is a particular fraud involving moral turpitude or intentional wrongdoing, so the malice referred to is not a malice implied in law, but a positive and special malice upon which the cause of action is founded, and, without proof of which the action could not be maintained. It is true that the fraud mentioned in the bankruptcy statute of 1867 [14 Stat. at L. 517, chap. 176] has been held to be a fraud involving moral turpitude or intentional wrong, and did not extend to a mere fraud implied by law. Hennequin v. Clews, 111 U. S. 676, 681, 28 L. ed. 565, 567, 4 Sup. Ct. Rep. 576; Forsyth v. Vehmeyer, 177 U. S. 177, 44 L. ed. 723, 20 Sup. Ct. Rep. 623. The reason given was that the word was used in the statute in association with a debt created by embezzlement, and such association was held to require the conclusion that the fraud referred to meant positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not a fraud which the law might imply and which might exist without the imputation of bad faith or immorality.

Assuming that the same holding would be made in regard to the fraud mentioned in the present act, it is clear that the cases are unlike. The implied fraud which the court in the above-cited cases released was of such a nature that it did not impute either bad faith or immorality to the debtor, while in a judgment founded upon a cause of action such as the one before us, the malice which is implied is of that very kind which does involve moral turpitude. This case is not, therefore, controlled in principle by the above-cited cases.

Case 1:04-cv-12553-RCL     Document 4     Filed 01/05/2005     Page 22 of 28

*People ex rel. Livergood v. Greer*, 43 Ill. 213, is also cited. The court there did hold that, under the Illinois insolvent law, an insolvent debtor was discharged from a judgment obtained by the father for the seduction of his daughter. The law discharging the debt extended by its terms to all tort feasors except where malice was the gist of the action, and the court said malice was not the gist of the action in question. The case is not opposed to the views we have already expressed.

It is not necessary in the construction we give to the language of the exception in the statute to hold that every wilful act which is wrong implies malice. One who negligently drives through a crowded thoroughfare and negligently runs over an individual would not, as we suppose, be within the exception. True, he drives negligently, and that is a wrongful act, but he does not intentionally drive over the individual. If he intentionally did drive over him, it would certainly be malicious. It might be conceded that the language of the exception could be so construed as to make the exception refer only to those injuries to person or property which were accompanied by particular malice, or, in other words, a malevolent purpose towards the injured person, and where the action could only be maintained upon proof of the existence of such malice. But we do not think the fair meaning of the statute would thereby be carried out. The judgment here mentioned comes, as we think, within the language of the statute, reasonably construed. The injury for which it was recovered is one of the grossest which can be inflicted upon the husband, and the person who perpetrates it knows it, is an offense of the most aggravated character; that it is a wrong for which no adequate compensation can be made, and hence personal and particular malice towards the husband as an individual need not be shown, for the law implies that there must be malice in the very act itself, and we think Congress did not intend to permit such an injury to be released by a discharge in bankruptcy.

An action to redress a wrong of this character should not be taken out of the exception on any narrow and technical construction of the language of such exception.

For the reasons stated, we think the order of the Court of Appeals of New York must be *affirmed.*

Mr. Justice Brown, Mr. Justice White, and Mr. Justice Holmes dissent.

CHARLES GAGNON, Appt.,

*v.*

UNITED STATES and the Sioux and Cheyenne Indians.

*Judgments—entry nunc pro tunc where no record exists.*

A judgment of naturalization which has never been recorded, or, if recorded, the record of which has been lost, cannot be entered by a common-law court *nunc pro tunc*, thirty-three years after its rendition, when no entry or memorandum appeared upon the record or files at the time the original judgment is supposed to have been rendered,—especially where the declaration of intention was made before another court, in another state, and the territorial court which is alleged to have entered the judgment has itself been abolished and a state court substituted in its place.

[No. 163.]

*Argued February 29, 1904. Decided March 21, 1904.*

APPEAL from the Court of Claims to review a judgment dismissing a petition filed under the Indian depredation act to recover the value of certain property taken by Indians in amity with the United States. *Affirmed.*

See same case below, 38 Ct. Cl. 10.

Statement by Mr. Justice Brown:

This was a petition filed in the court of claims in 1894 and amended in 1902, to recover the value of one half of certain property taken in 1866 from the firm of which the petitioner was a member by Indians then in amity with the United States.

The facts found in this case were substantially as follows: Charles Gagnon was a British subject. In March, 1858, he declared before the district court of Woodbury county, Iowa, his intention to become a citizen of the United States. He alleged that in 1863 he was admitted by the district court of Richardson county, in the territory of Nebraska, as a citizen of the United States, but no entry of this fact appeared in the records of that court for the year 1863.

It appeared Hosford & Gagnon, under which firm name they traded, owned horses and cattle of the aggregate value of $15,500 and in 1866, without just cause or provocation on their part, Indians belonging to the defendant tribes, then in amity with the United States, took them away. Hosford filed his claim for one half of the amount and obtained judgment, which has been satisfied. Gagnon's claim was for the remaining half.

Case 1:20-cv-03590-JEB   Document 1   Filed 07/16/2020   Page 23 of 28

caused them to receive an equivalent amount of corporate stock. He now seeks to avoid a judgment, because his own actions have rendered it impossible for him to get back to the beginning point.

This was not a proceeding in equity addressed to the court's discretion, but a demand at law upon an agent for return of something improperly received and disposed of. The defrauded principals tendered back everything received by them,—did all they could towards restoring original conditions. In such circumstances it is but just and right that any loss should fall on the unfaithful agent, not on his too-confiding principals. See Snow v. Alley, 144 Mass. 546, 551, 59 Am. Rep. 119, 11 N. E. 764; O'Shea v. Vaughn, 201 Mass. 412, 87 N. E. 616; Bigelow, Fr. 430, 431; Whart. Contr. § 285.

We think, in Heckscher v. Edenborn, the Court of Appeals reached a result well supported both by reason and upon authority, and that the courts below should have followed it when undertaking to determine rights depending upon the laws of New York. The action of the Circuit Court of Appeals is accordingly reversed; and the judgment of the trial court is affirmed.

Reversed.

Mr. Justice McKenna, Mr. Justice Day, and Mr. Justice Van Devanter dissent, being of opinion that the questions involved are of general, not local, law; that there has not been such restoration of the status quo as is essential to a recovery at law upon a rescission; and that, upon the facts specially found by the referee, the decision of the Circuit Court of Appeals was right.

(242 U. S. 137)

THOMAS P. ALDER, Petitioner,

v.

WILLIAM EDENBORN.

This case is governed by the decision in Sim v. Edenborn, ante, 36.

[No. 9.]

Argued May 5, 1915. Reargued October 23, 1916. Decided December 4, 1916.

ON WRIT of Certiorari to the United States Circuit Court of Appeals for the Second Circuit to review a judgment which reversed a judgment of the District Court for the Eastern District of New York in favor of plaintiff in a suit to rescind a contract for fraud, and to recover payments made thereunder. Reversed; judgment of trial court affirmed.

See same case below, 124 C. C. A. 339, 206 Fed. 275.

Mr. Theron G. Strong for petitioner.

Messrs. Joseph W. Bailey, Martin W. Littleton, and Owen N. Brown for respondent.

Mr. Justice McReynolds delivered the opinion of the court:

This cause is similar in all essential respects to Sim v. Edenborn, just decided [242 U. S. 131, 61 L. ed. 199, 37 Sup. Ct. Rep. 36]. Accordingly, the Circuit Court of Appeals' action is reversed, and the judgment of the trial court is affirmed.

Reversed.

(242 U. S. 138)

JOHN G. McINTYRE, Plff. in Err.,

v.

FREDERICK W. KAVANAUGH.

PARTNERSHIP ⊂⊃153(1)—INDIVIDUAL RESPONSIBILITY FOR FIRM'S TORT.

1. Partners are individually responsible for torts by the firm when acting within the general scope of its business, whether they personally participate therein or not.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 274, 276, 277; Dec. Dig. ⊂⊃153(1).]

BANKRUPTCY ⊂⊃424 — EFFECT OF DISCHARGE—LIABILITY FOR CONVERSION — "WILFUL AND MALICIOUS INJURY TO PROPERTY."

2. The unauthorized sale by a firm of brokers of certificates of stock held by them as collateral, and the appropriation of the avails to their own use, without the knowledge of the owner, is a wilful and malicious injury to property within the meaning of the provision of the Bankrupt Act of July 1, 1898 (30 Stat. at L. 550, chap. 541), § 17, as amended by the Act of February 5, 1903 (32 Stat. at L. 798, chap. 487, Comp. Stat. 1913, § 9601), that a discharge in bankruptcy shall not release the bankrupt from liability for wilful and malicious injuries to the person or property of another.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 787, 818; Dec. Dig. ⊂⊃424.

For other definitions, see Words and Phrases, First and Second Series, Wilful and Malicious Injury.]

[No. 88.]

Argued November 10, 1916. Decided December 4, 1916.

IN ERROR to the Supreme Court of the State of New York in and for the County of Saratoga, entered pursuant to the mandate of the Court of Appeals of that state, which affirmed a judgment of the Appellate Division of the Supreme Court, Third Department, affirming a judgment of the Trial Term of the Supreme Court in favor of plaintiff in an action against a discharged bankrupt to recover damages for conversion. Affirmed.

See same case below, in appellate division,

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

EXHIBIT

C

151 App. Div. 910, 135 N. Y. Supp. 1120; in court of appeals, 210 N. Y. 175, 104 N. E. 135.

The facts are stated in the opinion.

Mr. Robert H. Patton for plaintiff in error.

Mr. Myer Nussbaum for defendant in error.

Mr. Justice McReynolds delivered the opinion of the court:

Plaintiff in error was a member of T. A. McIntyre & Company, engaged in business as brokers. During February, 1908, the partnership received certain stock certificates owned by defendant in error, and undertook to hold them as security for his indebtedness, amounting to less than one sixth of their market value. Within a few weeks, without authority and without his knowledge, they sold the stocks and appropriated the avails to their own use. Shortly thereafter both firm and its members were adjudged bankrupts. After his discharge in bankruptcy this suit was instituted against plaintiff in error, seeking damages for the wrongful conversion. He set up his discharge and also personal ignorance of and nonparticipation in any tortious act.

The trial court held the liability was for wilful and malicious injury to property and expressly excluded from release by § 17 (2), Bankruptcy Act, as amended in 1903 (32 Stat. at L. 798, chap. 487, Comp. Stat. 1913, § 9601), and that the several partners were liable. A judgment for damages was affirmed by appellate division (151 App. Div. 910, 135 N. Y. Supp. 1120) and court of appeals (210 N. Y. 175, 104 N. E. 135).

That partners are individually responsible for torts by a firm when acting within the general scope of its business, whether they personally participate therein or not, we regard as entirely clear. Castle v. Ballard, 23 How. 172, 16 L. ed. 424; Re Peck, 206 N. Y. 56, 41 L.R.A.(N.S.) 1223, 99 N. E. 258, Ann. Cas. 1914A, 798. If, under the circumstances here presented, the firm inflicted a wilful and malicious injury to property, of course, plaintiff in error incurred liability for that character of wrong.

As originally enacted, § 17 of the Bankruptcy Act provided:

"A discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as . . . (2) are judgments in actions for frauds, or obtaining property by false pretenses or false representations, or for wilful and malicious injuries to the person or property of another; . . . (4) were created by his fraud, embezzlement,

misappropriation, or defalcation while acting as an officer or in any fiduciary capacity." [30 Stat. at L. 550, chap. 541, Comp. Stat. 1913, § 9601.]

This was amended by Act February 5, 1903, so as to read:

"A discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as . . . (2) are liabilities for obtaining property by false pretenses or false representations, or for wilful and malicious injuries to the person or property of another, or for alimony due or to become due, or for maintenance or support of wife or child, or for seduction of an unmarried female, or for criminal conversation; . . . or (4) were created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity." [32 Stat. at L. 798, chap. 487, Comp. Stat. 1913, § 9601.]

The trial court found—

That on February 5, 1908, McIntyre & Company by agreement obtained possession of Kavanaugh's stocks, worth approximately $25,000; and held them as security for his indebtedness, amounting to $3,853.32.

"That almost immediately after taking over said stocks by certificates as aforesaid by the said firm of T. A. McIntyre & Company, composed as aforesaid, and commencing on the very next day, said firm of T. A. McIntyre & Company (the above-named defendants being members thereof), without any notice to the plaintiff, and without his authority, knowledge, or consent, or demand of any kind upon him, sold and disposed of the identical certificates of such stock and scrip so turned over to them as aforesaid, and placed the avails thereof in the bank account of said firm of T. A. McIntyre & Company to the credit of said firm.

"That the various stocks aforesaid had all been disposed of prior to the 18th day of March, 1908, and that three quarters in value thereof had been disposed of on or prior to February 14th, 1908, or within nine days after the acquisition of the possession thereof by defendant's firm as aforesaid.

"That the above-named defendants, together with the other members of the said firm of T. A. McIntyre & Company, in disposing of said stocks aforesaid, without notice to or demand upon the plaintiff, and without his authority, knowledge, or consent, and in depositing the proceeds and avails thereof in the bank account to the credit of said firm of T. A. McIntyre & Company, committed wilful and malicious injury to the property of the plaintiff.

"That on April 23, 1908, the said firm

of T. A. McIntyre & Company filed a petition in bankruptcy in the United States district court for the southern district of New York, and were afterwards adjudicated bankrupts.

"That thereafter the plaintiff in this action proved his claim against the bankrupt estate without waiving any legal rights in this action or otherwise."

To deprive another of his property forever by deliberately disposing of it without semblance of authority is certainly an injury thereto within common acceptation of the words. Bouvier's Law Dict., "Injury." And this we understand is not controverted; but the argument is that an examination of our several Bankruptcy Acts and consideration of purpose and history of the 1903 amendment will show Congress never intended the words in question to include conversion. We can find no sufficient reason for such a narrow construction. And instead of subserving the fundamental purposes of the statute, it would rather tend to bring about unfortunate if not irrational results. Why, for example, should a bankrupt who had stolen a watch escape payment of damages, but remain obligated for one maliciously broken? To exclude from discharge the liability arising from such transactions as those involved in Crawford v. Burke, 195 U. S. 176, 49 L. ed. 147, 25 Sup. Ct. Rep. 9, and here presented, not improbably was a special purpose of the amendment.

In Tinker v. Colwell, 193 U. S. 473, 485, 487, 48 L. ed. 754, 759, 760, 24 Sup. Ct. Rep. 505, we said of original § 17 (2) : "In order to come within that meaning as a judgment for a wilful and malicious injury to person or property, it is not necessary that the cause of action be based upon special malice, so that without it the action could not be maintained." And further: "A wilful disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done wilfully and maliciously, so as to come within the exception. It is urged that the malice referred to in the exception is malice towards the individual personally, such as is meant, for instance, in a statute for maliciously injuring or destroying property, or for malicious mischief, where mere intentional injury without special malice towards the individual has been held by some courts not to be sufficient. Com. v. Williams, 110 Mass. 401. We are not inclined to place such a narrow construction upon the language of the exception. We do not think the language used was intended

to limit the exception in any such way. It was an honest debtor, and not a malicious wrongdoer, that was to be discharged."

The circumstances disclosed suffice to show a wilful and malicious injury to property for which plaintiff in error became and remains liable to respond in damages. The judgment below is affirmed.

---

(242 U. S. 142)

## CHESAPEAKE & OHIO RAILWAY COMPANY, Plff. in Err.,

v.

## L. P. McLAUGHLIN.

CARRIERS ⬤⇒218(10)—NOTICE OF CLAIM—EXCUSE FOR NONCOMPLIANCE.

Failure to comply with the stipulation in a "uniform live-stock contract" under which an interstate shipment was made, that no claim for damages which may accrue to the shipper under such contract shall be allowed or paid by the carrier, or sued for in any court by the shipper, unless claim for such loss or damage shall be made in writing, verified by the affidavit of the shipper or his agent, and delivered to the carrier's general claim agent, defeats any recovery from the carrier because of injury to the shipment, where there are no circumstances rendering such stipulation invalid or excusing noncompliance.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 674-696, 947; Dec. Dig. ⬤⇒218(10).]

[No. 100.]

Argued November 14, 1916.    Decided December 4, 1916.

IN ERROR to the Circuit Court of Pocahontas County in the state of West Virginia to review a judgment against a carrier for injuries to an interstate live-stock shipment. Reversed and remanded for further proceedings.

The facts are stated in the opinion.

Messrs. F. B. Enslow and Herbert Fitzpatrick for plaintiff in error.

No appearance for defendant in error.

* Mr. Justice McReynolds delivered the opinion of the court:

McLaughlin recovered judgment against the railway company in the circuit court, Pocahontas county, West Virginia, for injuries to a horse which it transported from Lexington, Kentucky, and delivered to him at Seebert, West Virginia, February 17, 1914.

The shipment was under a "uniform live-stock contract" signed by both parties and introduced in evidence by defendant in error, which, among other things, provides:

"That no claim for damages which may accrue to the said shipper under this con-

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

person" within meaning ing any person conduct imonwealth from assum e the name of any other consent of such person ive. China Clipper Res- 43) 45 N.E.2d 748, 312 v. Lowenstein's (1936) 1 33.

, § 5, cl. 16, which de- erson" could include a r 72, § 5, which provid ig on a business should to use in his business ormerly connected with the name of any other in connection with his it of such person, pur- f a corporation in the d not, without the con- ucting the business in ferring it to the corpo- siness, adopt his name rmed by them to carry ould recover damages of his protest to the ise by it of his name. v. Batchelder (1914) 12.

ssolving a partnership led that S. might use with his own, and he under the name P. & empted to transfer the er company, the for- and concurrent inter- of their names by the in a suit for injunc- Shaw Chocolate Co. fass. 505.

with his former part- n under the name P. cquired substantially cting with the corpo- orporation, to which pted to transfer the perly joined in a suit me. Page v. Page & ) 134 N.E. 377, 240

ir number, purchas- join his use of name ss to which partner- een first organized, o right and remedy 72, § 5. Kelly v. 18, 231 Mass. 574.

P.S.1882, c. 76, § 6, which authorized "legal representatives" to enjoin the use of decedent's name in a firm name, did not empower a daughter to maintain such suit, though the es- tate had been settled, and no administrator could have been appointed. Lodge v. Weld (1885) 2 N.E. 95, 139 Mass. 499.

**9. Burden of proof**

Plaintiff was not entitled to remedy under this section to restrain unauthorized use of name in conducting commercial enterprise, without al- leging and proving that defendant was using name in conjunction with his business. Thomp- son v. Spagnuolo (1942) 42 N.E.2d 498, 311 Mass. 597.

Under this section providing that person con- ducting business shall not continue to use name of person formerly connected with him in part- nership, or name of any other person without his consent in writing, one seeking to enforce such right has burden of proving that name, use of which he seeks to restrain, is in fact his name. Lowenstein v. Lowenstein's (1936) 1 N.E.2d 183, 294 Mass. 133.

That defendant's corporate title included word "Lowenstein" which was family name of plaintiff did not warrant conclusion that defen- dant assumed name of plaintiff in use of busi- ness, and in order for plaintiff to make out case under this section, plaintiff was bound to show that it was his name rather than name of some other person that defendant was using as part of its corporate name. Lowenstein v. Lowen- stein's (1936) 1 N.E.2d 183, 294 Mass. 133.

**10. Accounting**

Under P.S.1882, c. 76, §§ 6, 7, authorizing an injunction to restrain a person from using in his business the name of a former partner without his consent, or the consent of his legal represen- tatives, a person asking such injunction was at most entitled to compensation for his loss, and could not have an account of the profits made from the unauthorized use of his name. Law- rence v. Hull (1897) 47 N.E. 1001, 169 Mass. 250.

**11. Injunctive relief**

The effect of this section prohibiting any per- son conducting business in the commonwealth

from assuming the name of any other person, without written consent, is to give a right, un- known to common law or to equity, to restrain the unauthorized use by another of a person's name in conducting a commercial enterprise. China Clipper Restaurant v. Yue Joe (1943) 45 N.E.2d 748, 312 Mass. 540; Thompson v. Spag- nuolo (1942) 42 N.E.2d 498, 311 Mass. 597.

Under this section prohibiting any person conducting business in the commonwealth from assuming name of any other person, without written consent, no question of unfair competi- tion is involved and an injunction may be had to prevent violation of this section even where there is no damage. China Clipper Restaurant v. Yue Joe (1943) 45 N.E.2d 748, 312 Mass. 540; Lowenstein v. Lowenstein's (1936) 1 N.E.2d 183, 294 Mass. 133.

One who founded a business, permitted the organization of a corporation, and transferred his business to it, and became president, trea- surer, general manager, and a director, and signed all stock certificates, among which were shares of preferred stock sold for cash through his personal efforts, was not in equity entitled to restrain the use of his name as a part of the corporate name, notwithstanding this section, prohibiting use of name of person without his consent in writing. Caines v. Caines College of Physical Culture (1924) 142 N.E. 99, 247 Mass. 402.

Though the Henry Perkins Company and its predecessor, Henry Perkins, had long sold ma- chines as Perkins Machines, refusal of injunc- tion restraining H. K. Perkins and others from doing a somewhat similar business under the name "the H. K. Perkins Company" was war- ranted. Henry Perkins Co. v. Perkins (1923) 140 N.E. 461, 246 Mass. 96.

A detective named Robert Burns, operating the "Burns Detective Bureau" in the city of Boston, was not entitled to injunction to re- strain the "William J. Burns National Detective Agency, Inc.," from using the name "Burns Detective Bureau," "Burns Detective Agency," or "Burns Agency," despite defendant's action in securing a telephone listing with words "Burns Detective Agency" preceding the name "William J." Burns v. William J. Burns Inter- national Detective Agency (1920) 127 N.E. 334, 235 Mass. 553.

## § 4A. Use of word "corporation" or "incorporated" by individual or part- nership

No individual, unincorporated association or partnership shall assume or use in the name or title under which his or its business is transacted the word "corporation" or "incorporated" or any abbreviated form thereof or any word or phrase which may lead the public to believe that such individual, unincorpo- rated association or partnership is a corporation.
Amended by St.1976, c. 252, § 1.

283


EXHIBIT
D

**108A § 8**
Note 3

**3. Property acquired with partnership funds**

Under partnership agreement whereby premiums on policies taken out on partners' lives were made charge against partnership funds and were to be paid by firm when due, premiums were partnership debts, and in absence of agreement proceeds of policies were partnership assets, notwithstanding policies were payable to surviving partner. Kavanaugh v. Johnson (1935) 195 N.E. 797, 290 Mass. 587.

Structures erected for partnership with partnership funds on land of one of partners, sharing profits and devoting entire time to business, are partnership property. Marston v. Marston (1931) 177 N.E. 862, 277 Mass. 129.

Where a brick storehouse was built by a firm apparently for partnership business, and was paid for out of partnership funds, and a candle factory was rebuilt out of the proceeds of an insurance policy taken out by the firm in its name and paid for by it, both were properly regarded as partnership property, available to pay firm debts. Taber-Prang Art Co. v. Durant (1905) 75 N.E. 221, 189 Mass. 173.

If a person buys goods for a firm of which he is a member, the goods bought become the property of the firm, though he does not at the time disclose the name of his partner. Scott v. McKinney (1867) 98 Mass. 344.

When an ownership of a vehicle is in a partnership which adopts and uses a partnership name, the signing of the application for registration of a motor vehicle with the partnership name by one of the partners is of sufficient compliance with the provisions of law relative to registration, however when no such partnership name is in fact adopted and used by the firm, the names of all the partners should be signed to the application. 8 Op.Atty.Gen.1926, p. 18.

**4. Real estate**

Where the real estate was purchased by partners with partnership funds for partnership purposes, though conveyed to them as tenants in common, in the absence of an express agreement it will be treated as partnership property in equity. Dyer v. Clark (1843) 46 Mass. 562, 5 Metc. 562, 39 Am.Dec. 697; Howard v. Priest (1843) 46 Mass. 582, 5 Metc. 582.

If one partner purchase land to his own use with money taken out of the joint fund, the lands will not be joint stock. Pitts v. Waugh (1808) 4 Mass. 424; Goodwin v. Richardson (1814) 11 Mass. 469.

Realty purchased with partnership funds and conveyed to partners, no contrary intention appearing, became partnership property and was held by the grantees as tenants in partnership and not as tenants in common. Webber v. Rosenberg (1945) 64 N.E.2d 98, 318 Mass. 768.

Findings in an action by trustees under the will of a deceased partner to establish a trust in real estate used by the firm and purchased by the surviving partner in his own name, it was not shown as a matter of law that either of the partners ever intended that the property should belong to the firm. Magullion v. Magee (1922) 135 N.E. 565, 241 Mass. 355.

Where land is purchased by two persons, and two dwelling houses are built on it in their joint name, but occupied by them separately, such land will not, because of any apparent confusion of their interests, be deemed in equity partnership property against the evidence of the legal title, unless there be other sufficient and independent proof of the existence of a copartnership. Fall River Whaling Company v. Borden (1852) 64 Mass. 458, 10 Cush. 458.

Real estate purchased by partners for the partnership business, with the partnership funds, and conveyed to them by such a deed as would make them tenants in common, though considered at law as the several property of the partners, is subject to a trust arising by implication of law, by which it is liable to be sold and the proceeds brought into the partnership fund so far as necessary to pay the debts of the firm. Burnside v. Merrick (1842) 45 Mass. 537, 4 Metc. 537.

**5. Conveyance to partnership**

Where an estate is conveyed to the grantees in such form as to make them tenants in common, if it be paid for out of the partnership funds, it must be treated in equity as vesting in them in their partnership capacity, in trust for the use of the firm. Burnside v. Merrick (1842) 45 Mass. 537, 4 Metc. 537; Goodwin v. Richardson (1814) Dyer v. Clark (1843) 46 Mass. 562, 5 Metc. 562, 39 Am.Dec. 697, 11 Mass. 469.

## RELATIONS OF PARTNERS TO PERSONS DEALING WITH THE PARTNERSHIP

## § 9. Partner as agent of partnership; authority

(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partner-

52

**PAR**

ship
busin
unles
the p
of the

(2)
busin
unles

(3)
the b

(a)
prom

(b)

(c)
busin

(d)

(e)

(4)
bind

St.192:

**Unifor**
This
form I
Annota

Juris
gruder
Harv.L
Liabi
curred
han, 7
64 (196

Partr
WES
C.J.S

Com
Ag
 
 

Form
Ass
 

**EXHIBIT**
E
tabbies

ship name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

(2) An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

(3) Unless authorized by the other partners or unless they have abandoned the business, one or more but less than all the partners have no authority to:

(a) Assign the partnership property in trust for creditors or on the assignee's promise to pay the debts of the partnership,

(b) Dispose of the good will of the business,

(c) Do any other act which would make it impossible to carry on the ordinary business of the partnership,

(d) Confess a judgment,

(e) Submit a partnership claim or liability to arbitration or reference.

(4) No act of a partner in contravention of a restriction on his authority shall bind the partnership to persons having knowledge of the restriction.

### Historical and Statutory Notes

St.1922, c. 486, § 1.

**Uniform Law:**

This section is identical with § 9 of the Uniform Partnership Act. See 6 Uniform Laws Annotated, Master Edition.

### Law Review and Journal Commentaries

Jurisdiction over partnerships. Calvert Magruder and Roger S. Foster (May 1924) 37 Harv.L.Rev. 793.

Liability of dormant partner for debts incurred after dissolution. Cornelius J. Moynihan, 7 Ann.Surv.Mass.Law., Boston College, p. 64 (1960).

Rights and liabilities of an infant partner. (Jan. 1927) 40 Harv.L.Rev. 472.

Subagents and subservants. Warren A. Seavey (Feb. 1955) 68 Harv.L.Rev. 658.

### Library References

Partnership ⟨key⟩125–164.
WESTLAW Topic No. 289.
C.J.S. Partnership §§ 136–178.

**Comments.**
Agency, nonagency relations, see Alperin and Shubow, 14 Massachusetts Practice § 1.9 (3d ed.).

**Forms.**
Assignment for the benefit of creditors, see Stavisky, 16A Massachusetts Practice § 4921 (3d ed.).

Where the grantor is a partnership, see Stavisky, 15, 15A Massachusetts Practice §§ 160, 1112 (3d ed.).

**Texts and Treatises**

18 Mass Jur, Business Relationships §§ 16:1, 2, 4, 8-10.